RAYMOND CLIFTON PARKER, Plaintiff v. NEW HANOVER COUNTY, Defendant

No. COA04-1093

(Filed 18 October 2005)

### 1. Counties; Taxation— special assessment—inlet relocation—public purpose

A county's special assessment imposed upon landowners to pay for the relocation of an inlet was for a public purpose and thus did not violate the power of taxation clause set forth in N.C. Const. art. V, § 2, cl. 1 where the inlet was a navigable body of water subject to the public trust doctrine; our constitution, the public trust doctrine, and the State's public policy and legislation have long recognized the key role of the State and its political subdivision, including counties, in preserving beaches, ensuring the navigability and quality of waters, and taking proactive steps to protect property from hurricanes and other storms; and the public advantages of the relocation project, including increased navigability for vessels passing through the inlet, increased sand beaches for public recreation, better flushing of the tidal creeks, and increased ability of the coastline to survive the ravages of the annual hurricane season, are directly aimed at furthering the general welfare of the citizens of the county.

### 2. Counties— special assessment—landowner appeal

A landowner whose property was subject to a county's special assessment could properly challenge on appeal to the superior court whether the special assessment was authorized by statute, whether the method chosen was one permitted by the statute and, if so, whether the board of commissioners improperly abrogated its responsibilities under N.C.G.S. § 153A-186(d) in selecting that method.

### 3. Counties— special assessment—beach renourishment— statutory authority

A county's special assessment for an inlet relocation project was authorized by N.C.G.S. § 153A-185 where benefits of the project included hurricane protection, improvement of the watershed, and stopping erosion of the beaches in the county. Furthermore, beach renourishment was a proper method of countering beach erosion, one of the purposes permitted by the statute.

### 4. Counties— special assessment—inlet relocation—methods of assessment

A county board of commissioners complied with N.C.G.S. § 153A-186 in using different methods of assessment or a combination of methods for different geographical areas related to an inlet relocation project. To the extent that a benefitted landowner is contending that the board improperly designated benefit zones, erred in determining the benefit of the project to certain areas, and should have employed different methods within the zones, the board's decisions as to those issues are final and not subject to further review or challenge.

### 5. Counties— special assessment—no improper delegation of statutory responsibilities

A county board of commissioners did not improperly delegate to private homeowners associations its responsibilities under N.C.G.S. § 153A-186(d) for the determination of the special assessment method for an inlet relocation project where the board held a public hearing prior to the adoption of the final assessment resolution; the board held three other meetings at which the assessment was discussed by the board, its attorneys, and outside attorneys; and the special assessment method was discussed in meetings between county representatives and attorneys for the homeowners associations. While the board may not simply rubber stamp a private party's suggestions regarding a special assessment, the board may request input from outside parties, including the assessed landowners, as to which of the assessment methods provided by the statute the board should employ.

### 6. Appeal and Error— preservation of issues—failure to cite authority

Since plaintiff has cited no authority supporting his claims that a county's special assessment for an inlet relocation project violated his constitutional rights of equal protection, due process, and free speech, he has not properly presented those issues for appellate review.

Appeal by plaintiff from order entered 7 April 2004 by Judge W. Allen Cobb, Jr., in New Hanover County Superior Court. Heard in the Court of Appeals 24 March 2005.

*Johnson and Johnson, P.A., by Rebecca J. Davidson for plaintiff-appellant.*

*Marshall, Williams & Gorham, L.L.P., by William Robert Cherry, Jr., for defendant-appellee.*

GEER, Judge.

This appeal arises out of plaintiff Raymond Clifton Parker's objection to a special assessment imposed by defendant New Hanover County to pay for the relocation of Mason Inlet. Plaintiff appeals from an order granting the County's motion for summary judgment and denying his motion for partial summary judgment. In challenging the assessment, plaintiff contends (1) that the inlet project violated article V, § 2, clause 1 of the North Carolina Constitution because it did not have a public purpose; and (2) that the County violated N.C. Gen. Stat. §§ 153A-185 and 153A-186 (2003) in making the assessment. Because the record establishes that the public benefit from the relocation of Mason Inlet predominates over any private benefit and that the County properly fulfilled its responsibilities under N.C. Gen. Stat. §§ 153A-185 and 153A-186, we affirm.

## Facts and Procedural History

Figure Eight Island is a barrier island off the southeastern coast of the North Carolina mainland. It is bounded on its western shore by the Atlantic Intracoastal Waterway, on its eastern shore by the Atlantic Ocean, and on its southern shore by Mason Inlet, a body of water that connects the Intracoastal Waterway to the ocean. Another barrier island, Wrightsville Beach, lies to the south of Figure Eight Island, on the opposite side of Mason Inlet.

Mason Inlet has been migrating southward for several years, decreasing navigability for vessels passing through the inlet and blocking Mason Creek with a sand bar. The migration of the inlet has also caused the northern end of the Wrightsville Beach barrier island to erode, with the loss of a public beach and parking area, while the southern end of Figure Eight Island has experienced a corresponding accretion of sand. Wrightsville Beach is a public municipality; Figure Eight Island is a private island that is governed by the non-profit corporation Figure Eight Beach Homeowners' Association ("FEBHA"). Plaintiff is an owner of non-oceanfront property at the north end of Figure Eight Island and is a member of FEBHA.

In order to address the problems caused by the migrating inlet, FEBHA joined in a coalition with seven private homeowner associa-

tions in Wrightsville Beach to form the Mason Inlet Preservation Group ("MIPG"). MIPG represents 497 homeowners on North Wrightsville Beach and 563 homeowners on Figure Eight Island. These 1,060 homeowners represent a collective real estate property value of over $600 million. MIPG formulated a plan to achieve the goal of stabilizing Mason Inlet and relocating it to its 1970-1985 location. The plan entailed the excavation of a new channel across 1,000 feet of the new sand that had accrued on the southern end of Figure Eight Island. Sand removed in the course of this excavation would be used to plug the more southerly flow of the inlet on the Wrightsville Beach side. In addition, the excavated sand would be used to renourish beaches on Figure Eight Island and Wrightsville Beach.

At a meeting of the County's Board of Commissioners on 8 September 1998, MIPG reported to the Board its belief that "the only viable and environmentally sound solution to the southerly migration of Mason Inlet is to relocate and stabilize the inlet at its original 1970-1985 location. This location would provide additional beachfront, flush the tidal creeks, reopen the inlet to navigational use, and protect a significant amount of real estate property." At that meeting, MIPG requested that the County Board adopt a resolution supporting the relocation plan, but indicated that the project would be privately financed.

As stated in the minutes of the September 1998 meeting, Karen Erickson, an environmental and coastal engineer, advised the County Board that the following events had occurred as a result of the southern migration of Mason Inlet:

(1) A large public beach, county access and parking area at the North end of Wrightsville Beach have, been lost.

(2) Shell Island Resort is in immediate danger of destruction and loss.

(3) Figure Eight Island has experienced severe erosion and property losses.

(4) Beach property values south of the resort have depreciated significantly.

(5) Sand deposits are covering and negatively impacting the living biological resources in the estuary.

(6) Mason's Creek has in-filled with sand reducing flushing and water exchange from Howe Creek.

She also predicted that if the inlet was not relocated, removal of sand tubes—due to occur the following year—would result in large scale damage and beach debris; the inlet would continue to migrate south at the rate of one foot per day; there would be large scale loss of beaches for public use; and $600 million of real estate would be threatened by the inlet. She suggested that the relocation project would result in the following benefits:

(1) [Provide] [a]dditional beach for public beach use and fishing.

(2) Provide sand and protection to threatened properties on Wrightsville Beach and Figure Eight Island valued at $600,000,000.

(3) Open Mason's Creek for navigational use and improve flushing at Howe Creek.

(4) Prevent further sand coverage of living biological resources.

(5) Provide [an] environmentally sound solution to a major problem.

Following discussion, the Board unanimously adopted a resolution supporting the development of "an inlet management plan to relocate or stabilize Mason Inlet to protect and preserve the sand resources and beaches of Figure Eight Island and the Town of Wrightsville Beach," which beaches were all located within the County. As a basis for this resolution, the Board cited its "long recogni[tion] that the Atlantic Coast beaches of the County are an important natural resource which serves as an important recreational asset and provides storm protection for the adjoining towns;" its belief that oceanfront residential properties and businesses were enhanced by the existence of healthy, non-eroding beaches in the Town of Wrightsville Beach; the erosion and depreciated property values resulting from the instability of Mason Inlet; the effect of the southerly movement of the inlet in decreasing the supply of oceanfront land within the County; the Board's determination "that it is critical to the best interests of property and land owners within the County to provide for long-range erosion control and property protection to revitalize the decaying beaches;" and the Board's view that "the beaches of New Hanover County are a County-wide asset and a direct benefit to all property owners and residents as well as the general public."

In February 1999, MIPG returned to the Board to request public financing for the project because it had concluded that the venture

PARKER v. NEW HANOVER CTY.

[173 N.C. App. 644 (2005)]

was too risky to be financed solely by the private homeowner associations. MIPG proposed instead that New Hanover County fund the project through a special assessment of those property owners affected by the relocation of the inlet. The Board responded that "the Commissioners want to be assured that the members of the Homeowner Associations are in favor of the inlet relocation project, and they are willing to pay the special assessment. Once this is understood, the Board will be able to render a decision [on whether to publicly fund the project]. The Commissioners are not comfortable with telling the public that [the affected] property owners are willing to be assessed when these residents may not agree with the proposal." The Board then approved a motion to request that MIPG go back to its constituent homeowner associations to obtain express approval for the project, including the imposition of the special assessment.

At the Board's 19 April 1999 meeting, MIPG reported that it had surveyed the property owners comprising the homeowner associations making up MIPG and that 91% of those responding and 63% of the total homeowner association membership had approved of a special assessment for the inlet relocation project. Plaintiff was one of 53 landowners on Figure Eight who voted against the special assessment.

At that time, the estimated overall cost of the project was $4,221,387. MIPG's recommendation allocated $1.4 million of this cost to the 563 property owners in FEBHA, and the remaining $2,821,387 to the 481 Wrightsville Beach property owners and their seven homeowner associations. According to the Board's minutes, MIPG's representative stated that the proposed allocation was calculated according to a formula using property values and distance from the inlet to allocate a fair share assessment to the homeowners in these associations. MIPG's representative also stated that certain homeowner associations, including FEBHA, would develop their own proposed cost allocation formula. By a unanimous vote, the County Board voted to become the lead sponsor of the Mason Inlet relocation project. In a separate vote of three to two, the County Board agreed to use the Room Occupancy Tax Fund to initially finance the relocation project with reimbursement of the County through the special assessment of each benefitted property owner.

At a 17 May 1999 meeting, the Board issued a Preliminary Assessment Resolution for the Mason Inlet relocation project. The resolution provided:

1. It is intended that a beach erosion control project be constructed by relocation of Mason Inlet to a point approximately 3,000 feet north of its present location. The sand excavated from the newly dredged channel will be used to close the existing inlet and to provide beach nourishment to the beaches of Figure Eight Island. . . .

2. One hundred percent of the net cost of the project shall be assessed against the benefitted properties.

The resolution stated that the basis for the assessment would be different for Figure Eight properties than for Wrightsville Beach properties because of the differing nature of the benefits on each side of Mason Inlet, but expressed "the intention of the Board of Commissioners to assess each lot or parcel of land according to the benefit conferred upon it by the project."

With respect to Figure Eight Island, the resolution found all the residential lots to be benefitted properties, but provided for a different assessment based on the location of a lot on the island. One classification of lots (ocean/inlet front lots) was to be assessed 56.6% of the Figure Eight allocation at an equal rate per foot of shoreline frontage and a second classification of lots (the remaining non-oceanfront lots) was to be assessed 43.4% of the allocation at an equal rate based on area of land in each lot.

At the 21 June 1999 Board meeting, the County Board adopted, at the suggestion of the attorney for FEBHA, a revised preliminary assessment resolution. The revised assessment changed the methodology for calculating the amount that the non-oceanfront lots on Figure Eight would be assessed: While the first resolution proposed using land area of the lots as the basis for calculating the assessment, the revision used the tax value of the land not counting improvements. The FEBHA attorney explained to the Board that using land area as the assessment basis had turned out to be unfair because "some of the largest lots further away from the project were being assessed at unusually high values compared to lots that were close to the project." The revised resolution stated that the Board would conduct a public hearing on the matters covered by the resolution on 12 July 1999.

At the 12 July 1999 hearing, the FEBHA attorney and the Chairman of MIPG explained MIPG's efforts to work with the County's legal staff to "develop[] assessment allocations that would be close to the amounts provided to the benefitted property owners

and still comply to the North Carolina General Statutes." An opportunity followed for the public to offer comments on the resolution. Plaintiff Parker, who was present at the meeting, voiced his objections to the resolution because of what he argued was the Board's unlawful delegation to MIPG and FEBHA of the Board's own task of establishing an assessment method under N.C. Gen. Stat. § 153A-186. The County Attorney responded to plaintiff's concern by noting that "all three attorneys involved in the process held meetings for several days when the resolution was drafted. Consultation was made with Mr. Jake Wicker, author of Assessment Statute at the Institute of Government, to be sure the document was in compliance with NCGS 153A-186, Bases for Making Assessments. Mr. Parker has a right to go to court, but all three attorneys involved in the process have done everything possible to comply [with] State Law." Following the public hearing, the County Board, in a vote of three to two, adopted the revised resolution approved in June as the Board's Final Assessment Resolution for the Mason Inlet relocation project.

Following completion of the project, the County Board held a public hearing, on 2 December 2002, regarding confirmation of the final assessment roll. Plaintiff spoke in opposition to the roll, arguing that properties at the north end of Figure Eight Island should not be assessed and that the assessment methodology subsidized oceanfront properties at the expense of non-oceanfront properties. Following the hearing, the Board unanimously confirmed the final assessment roll. The final assessment roll listed plaintiff's total assessment at $4,414.00.

On 9 December 2002, plaintiff filed suit against New Hanover County, seeking a declaratory judgment that the County's actions in connection with the Mason Inlet relocation project assessment were "unconstitutional, *ultra vires* and void." Plaintiff also asserted a claim under 42 U.S.C. § 1983 for violation of his rights under the first, fifth, and fourteenth amendments to the Constitution.[1] On 12 March 2004, the County moved for summary judgment as to all claims. Plaintiff moved for partial summary judgment on 25 March 2004 on the issue whether the special assessment was unconstitutional, ultra vires, and void. The trial court entered its order on 7 April 2004 grant-

---

1. Plaintiff earlier filed a separate lawsuit against FEBHA and the County, challenging an agreement between FEBHA and the County regarding maintenance of the relocated inlet. The trial court's grant of summary judgment to defendants was affirmed by this Court in *Parker v. Figure "8" Beach Homeowners' Ass'n*, 170 N.C. App. 145, 611 S.E.2d 874 (2005).

ing defendant's motion for summary judgment and denying plaintiff's motion for partial summary judgment. Plaintiff timely appealed from that order.

## Discussion

### I. The Constitutionality of the Assessment under the North Carolina Constitution

[1] Plaintiff first argues that the special assessment levied on his property by the County was imposed for a private purpose rather than a public one, and, therefore, the assessment violated the state constitution's Power of Taxation Clause. Our state constitution provides that "[t]he power of taxation shall be exercised in a just and equitable manner, for public purposes only, and shall never be surrendered, suspended, or contracted away." N.C. Const. art. V., § 2, cl. 1. Our Supreme Court has held that "[t]he determination of whether a particular function or activity constitutes a public purpose is a legal issue to be decided by the court." *Madison Cablevision, Inc. v. City of Morganton*, 325 N.C. 634, 653, 386 S.E.2d 200, 211 (1989).

Although the Supreme Court has been required to address what constitutes a public purpose on a number of occasions, it has not specifically defined "public purpose," but rather has left the issue to be decided on a case-by-case basis. *Maready v. City of Winston-Salem*, 342 N.C. 708, 716, 467 S.E.2d 615, 620 (1996). The Court has, however, set out "[t]wo guiding principles . . . for determining that a particular undertaking by a municipality is for a public purpose," *Madison Cablevision*, 325 N.C. at 646, 386 S.E.2d at 207: "(1) it involves a reasonable connection with the convenience and necessity of the particular municipality; and (2) the activity benefits the public generally, as opposed to special interests or persons." *Id.* (internal citations omitted).

In *Maready*, the Supreme Court explained, with respect to the first prong of the test, that "whether an activity is within the appropriate scope of governmental involvement and is reasonably related to communal needs may be evaluated by determining how similar the activity is to others which this Court has held to be within the permissible realm of governmental action." *Maready*, 342 N.C. at 722, 467 S.E.2d at 624. We hold that the relocation of an inlet "is within the appropriate scope of governmental involvement" and is a "proper governmental function." *Id.* at 722-23, 467 S.E.2d at 624.

Mason Inlet is a navigable body of water subject to the public trust doctrine. *Gwathmey v. State*, 342 N.C. 287, 298, 464 S.E.2d 674,

681 (1995). Under the public trust doctrine, the lands under navigable waters "are held in trust by the State for the benefit of the public" and "the benefit and enjoyment of North Carolina's submerged lands is available to all its citizens, subject to reasonable legislative regulation, for navigation, fishing and commerce." *State ex rel. Rohrer v. Credle*, 322 N.C. 522, 527, 369 S.E.2d 825, 828 (1988). As the United States Supreme Court has stated, in discussing the public trust doctrine, "navigable waters uniquely implicate [a state's] sovereign interests." *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 284, 138 L. Ed. 2d 438, 457, 117 S. Ct. 2028, 2041 (1997).

Recognizing the importance of the State's lands and waters, our constitution provides:

It shall be the policy of this State to conserve and protect its lands and waters for the benefit of all its citizenry, and to this end *it shall be a proper function of the State of North Carolina and its political subdivisions* to acquire and preserve park, recreational, and scenic areas, to control and limit the pollution of our air and water, to control excessive noise, and *in every other appropriate way to preserve as a part of the common heritage of this State its forests, wetlands, estuaries, beaches*, historical sites, openlands, and places of beauty.

N.C. Const. art. XIV, § 5 (emphases added). Consistent with this provision, our General Assembly enacted the Coastal Area Management Act, finding:

[A]mong North Carolina's most valuable resources are its coastal lands and waters. The coastal area, and in particular the estuaries, are among the most biologically productive regions of this State and of this nation. . . . North Carolina's coastal area has an extremely high recreational and esthetic value which should be preserved and enhanced.

N.C. Gen. Stat. § 113A-102(a) (2003). Further, our General Assembly has specifically stated: "It is declared to be a necessary governmental responsibility to properly manage and protect North Carolina's beaches from erosion . . . ." 2000 N.C. Sess. Laws ch. 67, § 13.9(a)(17).[2]

---

2. In conjunction with this declaration, the General Assembly further found that North Carolina's beaches are vital to the State's tourism industry; that North Carolina's beaches belong to all the State's citizens and provide recreational and economic benefits to our residents state-wide; that beach erosion can threaten the economic viability of coastal communities and significantly affect State tax revenues; that beach nourishment provides hurricane flood protection, enhances the attractiveness of beaches to

With respect to the role of counties, the General Assembly has specifically provided: "A county may appropriate revenues not otherwise limited as to use by law to finance the acquisition, construction, reconstruction, extension, maintenance, improvement, or enlargement of groins, jetties, dikes, moles, walls, sand dunes, vegetation, *or other types of works or improvements that are designed for controlling beach erosion, for protection from hurricane floods, or for preserving or restoring facilities and natural features that afford protection to the beaches* and other land areas of the county and to the life and property of the county." N.C. Gen. Stat. § 153A-438 (2003) (emphasis added). A county is also authorized to make special assessments against benefitted property for such projects. N.C. Gen. Stat. § 153A-185.

Thus, our constitution, the public trust doctrine, and the State's public policy and legislation have long recognized the key role of the State and its political subdivisions, including counties, in preserving beaches, in ensuring the navigability and quality of waters, and in taking proactive steps to protect property from hurricanes and other storms. We hold that the activity of relocation of an inlet for such purposes meets the first prong of *Madison Cablevision*. The importance of governmental involvement in activities designed to meet these concerns has been brought home particularly keenly by recent hurricanes and their devastating impact along the Gulf Coast of the United States.

The second prong of *Madison Cablevision* may be met "so long as [activities] primarily benefit the public and not a private party." *Maready*, 342 N.C. at 724, 467 S.E.2d at 625. It is not, however, "necessary that a particular use benefit every citizen in the community to be labeled a public purpose." *Madison Cablevision*, 325 N.C. at 646, 386 S.E.2d at 207. Moreover, an activity "does not lose its public purpose merely because it involves a private actor. Generally, if an act will promote the welfare of a state or a local government and its citizens, it is for a public purpose." *Maready*, 342 N.C. at 724, 467 S.E.2d at 625. The *Maready* Court held that a public purpose exists if "[t]he public advantages are not indirect, remote, or incidental; rather, they are directly aimed at furthering the general economic welfare of the people of the communities affected." *Id.* at 725, 467 S.E.2d at 625.

---

tourists, restores habitat for wildlife, and provides additional public access to beaches; and a program of beach management and restoration should not be accomplished without a commitment of local funds because local beach communities derive the primary benefits from the presence of adequate beaches. 2000 N.C. Sess. Laws ch. 67, § 13.9(a).

Plaintiff argues that the public benefit was incidental to the private benefit achieved by relocation of the inlet. We disagree. The Board's resolutions supporting the project and providing for an assessment identified the project as "an inlet management plan" and "beach erosion control project" designed to protect and preserve County sand resources and beaches, which "serve[] as an important recreational asset and provide[] storm protection of the adjoining towns." The resolutions also point to the project's goals of (1) stopping the decrease of oceanfront land within the County (resulting from the inlet's migration south), (2) maximizing property values and the County's tax base, and (3) unblocking Mason Creek and most of the other tidal creeks in the area, the blockage of which had been "adversely affecting overall water circulation, covering wetland habitat and living biological resources, [and] interfering with navigation and recreational use of the estuary." According to Board minutes it is expected that the relocated inlet, with ongoing maintenance, will continuously facilitate coastal marsh flushing and recreational navigation.

In addition, the record identifies more specifically that a large public beach, county access, and a parking area had been lost at the north end of Wrightsville Beach because of the inlet's migration. By moving the inlet back to its prior location, that public beach area could be restored. Further, without relocation, the County could anticipate additional large scale loss of public beaches.

Although plaintiff points to other benefits from the relocation project that he contends are private, such as the protection of Shell Island Resort from destruction and the enhancement of beaches on Figure Eight Island, the record contains information suggesting that even those effects will benefit the public to a degree. According to Board minutes, with the collapse of Shell Island Resort, the County would be confronted with the cost of cleaning the resulting debris from public beaches. In addition, the minutes indicate that healthy beaches on Figure Eight Island, a barrier island, help provide storm protection to other parts of the County.

In any event, even if those benefits were purely private, the public advantages from the relocation project—including increased navigability for vessels passing through the inlet between the Intracoastal Waterway and the ocean, increased sand beaches for public recreation and fishing purposes, better flushing of the tidal creeks, and increased ability of the coastline to survive the ravages of the annual hurricane season—"are not indirect, remote, or incidental." *Id.*

Rather, they are directly aimed at furthering the general welfare of the citizens of New Hanover County. Accordingly, because we are satisfied that both prongs of *Maready* are met, we hold that the County's special assessment did not violate the public purpose requirement of N.C. Const. art. V., § 2, cl. 1.

## II. Compliance with N.C. Gen. Stat. § 153A-185 and N.C. Gen. Stat. § 153A-186

Plaintiff next argues that the Board's imposition of the special assessment did not comply with N.C. Gen. Stat. §§ 153A-185 and 153A-186. Specifically, plaintiff argues that N.C. Gen. Stat. § 153A-185 does not authorize a special assessment for a project such as the inlet relocation. With respect to N.C. Gen. Stat. § 153A-186, plaintiff contends that the County (1) improperly delegated determination of the method for the assessment to private parties and (2) used an improper method of assessment. The County argues in response that plaintiff is precluded from asserting these arguments by N.C. Gen. Stat. § 153A-186(d). We address each argument separately.

### A. Plaintiff's Ability to Challenge the Assessment

[2] Article 9 of Chapter 153A of the General Statutes sets out North Carolina's statutory scheme regarding special assessments by counties. N.C. Gen. Stat. § 153A-197 (2003), a part of Article 9, provides for appeal of an assessment:

> If the owner of, or any person having an interest in, a lot, parcel, or tract of land against which an assessment is made is dissatisfied with the amount of the assessment, he may, within 10 days after the day the assessment roll is confirmed, file a notice of appeal to the appropriate division of the General Court of Justice. He shall then have 20 days after the day the roll is confirmed to serve on the board of commissioners or the clerk a statement of facts upon which the appeal is based. The appeal shall be tried like other actions at law.

N.C. Gen. Stat. § 153A-186, which sets out the different methods by which a board of commissioners may calculate special assessments provides, however: "The board's decision as to the method of assessment is final and not subject to further review or challenge." N.C. Gen. Stat. § 153A-186(d).

Reading §§ 153A-186(d) and 153A-197 together, the plain language of each statute suggests that while a landowner may appeal a special

assessment, he may not challenge the board of commissioners' choice of which method or methods provided for in the statute should be used in calculating the assessment. Nothing, however, in N.C. Gen. Stat. § 153A-186(d) precludes a property owner from arguing that the special assessment was for a purpose not authorized by statute, that the board of commissioners improperly abrogated its responsibilities under § 153A-186(d) in choosing a method of calculation, or that the method chosen was not one permitted by the statute.

This view of § 153A-186(d) is consistent with *In re Dunn*, 73 N.C. App. 243, 326 S.E.2d 309, *disc. review denied*, 313 N.C. 602, 332, S.E.2d 180 (1985), in which this Court construed the identically worded statute applying to cities. The *Dunn* Court held "that the decisions of the city council as to the method of assessment and the total cost of an improvement are final and conclusive and not subject to further review or challenge." *Id.* at 247, 326 S.E.2d at 312. On appeal to a superior court and this Court, "the owner of assessed property has no right to be heard there on the question of whether the lands are benefitted or not, but only on the validity of the assessment, its proper apportionment and other questions of law." *Id.* (internal citations omitted).

Based on the plain language of N.C. Gen. Stat. § 153A-186(d) and on *Dunn*, we hold that plaintiff may properly challenge on appeal whether the special assessment was authorized by statute, whether the method chosen was one permitted by the statute, and, if so, whether the board of commissioners improperly abrogated its responsibilities under § 153A-186(d) in selecting that method. Questions such as these deal solely with the validity of the assessment and whether the County followed proper procedure in adopting it. *See Dunn*, 73 N.C. App. at 245, 326 S.E.2d at 311 (in holding that the plaintiff could not appeal the issues he had raised, noting that the plaintiff "does not contend that the City failed to follow proper procedure in making the assessment").

B. Compliance with N.C. Gen. Stat. § 153A-185

[3] N.C. Gen. Stat. § 153A-185 grants counties authority to make special assessments against benefitted properties for all or part of the costs of:

> (3) Acquiring, constructing, reconstructing, extending, renovating, enlarging, maintaining, operating, or otherwise building or improving

    a. Beach erosion control or flood and hurricane protection works; and

    b. Watershed improvement projects, drainage projects and water resources development projects (as those projects are defined in G.S. 153A-301).

Plaintiff argues that the County was not authorized to impose a special assessment for the inlet relocation project because it was not a "beach erosion control" project.

We first note that the record indicates that the benefits of the project included hurricane protection and improvement of the watershed. Further, it is undisputed that moving the inlet was intended to stop the erosion of the beaches in the City of Wrightsville Beach. These purposes for the project all fall within the permissible bases for a special assessment.

Plaintiff, however, contends that the beach renourishment on Figure Eight does not constitute one of the purposes permitted by the statute. To the contrary, it is well-established that beach renourishment is one of the methods of countering beach erosion. As the North Carolina Department of Environment and Natural Resources has stated in its general policy guidelines for the coastal area:

    (a) Pursuant to Section 5, Article 14 of the North Carolina Constitution, proposals for shoreline erosion response projects shall avoid losses to North Carolina's natural heritage. . . .

    (b) Erosion response measures designed to minimize the loss of private and public resources to erosion should be economically, socially, and environmentally justified. . . .

    (c) The replenishment of sand on ocean beaches can provide storm protection and a viable alternative to allowing the ocean shoreline to migrate landward threatening to degrade public beaches and cause the loss of public facilities and private property. Experience in North Carolina and other states has shown that beach restoration projects can present a feasible alternative to loss or massive relocation of oceanfront development. In light of this experience, beach restoration and sand nourishment and disposal projects may be allowed when:

    (1) Erosion threatens to degrade public beaches and to damage public and private properties;

(2) Beach restoration, renourishment or sand disposal projects are determined to be socially and economically feasible and cause no significant adverse environmental impacts;

(3) The project is determined to be consistent with state policies for shoreline erosion response and state use standards for Ocean and Hazard and Public Trust Waters Areas of Environmental Concern and the relevant rules and guidelines of state and federal review agencies.

15A N.C. Admin. Code 7M.0202 (2005). *See also* 33 C.F.R. § 263.26 (providing with respect to small beach erosion control projects that "periodic nourishment may be recommended"); Barbara Affeldt, *Beach Erosion and Hurricane Protection in the Second Circuit: The Statute of Limitations as a Government Nemesis*, 2 N.Y. City L. Rev. 29, 30 n.4 (1998) ("Beachfill or nourishment is the process by which beach-compatible sand is dredged from the bed of a waterbody and pumped onto the beach to provide hurricane protection and beach erosion-control.").

In short, the record establishes that the Mason Inlet project was one for which a special assessment is authorized. Plaintiff's contention that the County violated N.C. Gen. Stat. § 153A-185 is without merit.

C. Compliance with N.C. Gen. Stat. § 153A-186

[4] Plaintiff next contends that the assessment method adopted by the Board was not one permitted by N.C. Gen. Stat. § 153A-186 in that the Board used different methods of assessment for different geographical areas related to the project. N.C. Gen. Stat. § 153A-186(b) provides:

(b) For beach erosion control or flood and hurricane protection works, watershed improvement projects, drainage projects and water resources development projects, assessments may be made on the basis of:

(1) The frontage abutting on the project, at an equal rate per foot of frontage; or

(2) The frontage abutting on a beach or shoreline or watercourse protected or benefited by the project, at an equal rate per foot of frontage;

(3) The area of land benefited by the project, at an equal rate per unit of area; or

(4) The valuation of land benefited by the project, being the value of the land without improvements as shown on the tax records of the county, at an equal rate per dollar of valuation; or

(5) *A combination of two or more of these bases.*

(Emphasis added.) The statute further provides that when the basis selected for assessment is either area or valuation, the Board is required for assessments under N.C. Gen. Stat. § 153A-185(3) to "provide for the laying out of one or more benefit zones according . . . to the distance from the shoreline or watercourse, the distance from the project, the elevation of the land, *or other relevant factors.* If more than one benefit zone is established, the board shall establish differing rates of assessment *to apply uniformly throughout each benefit zone.*" N.C. Gen. Stat. § 153A-186(c) (emphases added).

Thus, contrary to plaintiff's contentions, the statute specifically anticipates that a project may require different methods for different geographical areas involved in the project and that a combination of methods may be used. To the extent that plaintiff is contending that the Board improperly designated benefit zones, erred in determining the benefit of the project to certain areas, and should have employed different methods within the zones, the Board's decision as to those issues "is final and not subject to further review or challenge." N.C. Gen. Stat. § 153A-186(d). *See also Dunn,* 73 N.C. App. at 247, 326 S.E.2d at 312 (holding that city council's decisions regarding whether the street improvements abutted the plaintiff's property and whether they benefitted his property were questions with respect to which the city council's determination was final and conclusive).[3]

[5] Plaintiff also contends that the Board in this case improperly delegated its responsibilities under § 153A-186(d) for the determination of the assessment method to FEBHA and/or MIPG. As a basis for this contention, plaintiff points to two remarks—one by the County Attorney and the other by the Chair of the Board—at a single board meeting regarding the preliminary assessment resolution. The record, however, also evidences a public hearing before the Board prior to adoption of the final assessment resolution with numerous individ-

---

3. The Board's compliance with the pertinent statutes also disposes of plaintiff's contention that the assessment was not imposed in a just and equitable manner in violation of N.C. Const. art. V, § 2(1). Plaintiff does not cite any authority to support this contention. Without the citation of any authority by plaintiff, we will not hold that a method deemed appropriate by the General Assembly is unjust and inequitable under the state constitution. *See* N.C.R. App. P. 28(b)(6).

uals speaking in favor of and against the resolution (including plaintiff); three other board meetings at which the assessment for the inlet relocation was discussed by the Board, its attorneys, and outside attorneys; and other meetings between county representatives and attorneys for MIPG and FEBHA at which the details of the special assessment method were discussed. We hold that the record, taken in full, indicates that the Board did, in fact, perform its responsibility under § 153A-186(d) to "endeavor to establish an assessment method from among the bases set out in this section." While the Board may not simply "rubber stamp" a private party's suggestions regarding a special assessment, the Board may request input from outside parties, including the assessed landowners themselves, as to which of the assessment methods the Board should employ. Indeed, plaintiff took advantage of this opportunity by speaking against the proposed assessment.

For these reasons, we conclude that the Board's special assessment did not violate N.C. Gen. Stat. § 153A-186(d). Further, the record does not indicate that the Board improperly delegated its statutory responsibilities regarding that assessment.

III. Due Process and Equal Protection Claims

[6] Plaintiff also contends that issues of fact remain as to whether the imposition of the special assessment violates his equal protection, due process, and free speech rights under the federal and state constitutions. Since the plaintiff has cited no authority supporting his claim that his constitutional rights were violated, he has not properly presented these issues for appellate review. N.C.R. App. P. 28(b)(6) (providing that "[a]ssignments of error . . . in support of which no reason or argument is stated or authority cited, will be taken as abandoned").

With respect to equal protection, plaintiff does cite generally *Edward Valves, Inc. v. Wake County*, 343 N.C. 426, 471 S.E.2d 342 (1996), *cert. denied*, 519 U.S. 1112, 136 L. Ed. 2d 839, 117 S. Ct. 952 (1997). In that case, however, the North Carolina Supreme Court expressly declined to address the question whether the County tax at issue violated equal protection and held only that the taxpayer was not limited to his state law statutory remedy, but could also sue under 42 U.S.C. § 1983. The Court never addressed the merits of the plaintiff's claims. Plaintiff does not reference or discuss the underlying Court of Appeals opinion, *Edward Valves, Inc. v. Wake County*, 117 N.C. App. 484, 451 S.E.2d 641 (1995), *aff'd as modified in part and*

*disc. review improvidently allowed in part*, 343 N.C. 426, 471 S.E.2d 342 (1996), which did address the merits of the equal protection claim. That opinion, however, involved a county taxing a class of property in some situations and not at all in other situations. *Id.* at 491, 451 S.E.2d at 646. The opinion provides no insight regarding the proper analysis when a plaintiff, as in this case, argues that a different methodology should have been used in calculating his tax. In the absence of citation of any authority on this point by either party, we decline to address the equal protection issue.

With respect to due process and free speech, plaintiff argues only that the notice regarding the public hearing pursuant to N.C. Gen. Stat. § 153A-194 (2003) mailed to affected property owners stated that the property owner "will be assessed" in the amount set forth in the proposed preliminary assessment roll, that the Board "shall confirm" the amount after the public hearing, and that "[t]he purpose of the hearing is not to receive comments regarding the basis of the assessments, but rather to consider the clerical and mathematical accuracy of individual assessments." Plaintiff argues that the notice suggested that the result of the hearing was predetermined, denying him notice and an opportunity to be heard and chilling his right to free speech. Plaintiff has again cited no authority supporting his contentions and we deem them abandoned.

We note, in addition, however, that the Board had previously conducted a public hearing prior to adopting the final assessment resolution setting forth the methodology for the assessment. At that hearing, interested parties, including plaintiff, were allowed to voice their objections to the assessment methodology. Further, the notice to which plaintiff objects notified the property owners that they would be heard regarding the clerical and mathematical accuracy of individual assessments. Plaintiff had multiple opportunities to voice his objections to the propriety of the assessment and its methodology. Plaintiff has set forth no reason why the Board was constitutionally obligated to give him another opportunity.

## Conclusion

Accordingly, we hold that the trial court was correct in entering summary judgment in favor of New Hanover County and in denying plaintiff's motion for partial summary judgment.

Affirmed.

Judges TIMMONS-GOODSON and CALABRIA concur.